# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 13, 2013

## TIRRONE AKILLIA SIMPKINS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2009-D-2955     Steve Dozier, Judge**

**No. M2012-01558-CCA-R3-PC Filed - February 28, 2013**

Tirrone Akillia Simpkins ("the Petitioner") pleaded guilty to one count of aggravated robbery and four counts of especially aggravated kidnapping. Pursuant to his plea agreement, the trial court sentenced the Petitioner as a Range II offender to an effective sentence of fifteen years to be served at 100%. The Petitioner subsequently filed for post-conviction relief, which the post-conviction court denied following an evidentiary hearing. The Petitioner now appeals, arguing that his plea was constitutionally invalid and that he received ineffective assistance of counsel in conjunction with the plea submission hearing. Upon our thorough review of the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Ryan C. Caldwell, Nashville, Tennessee, for the appellant, Tirrone Akillia Simpkins.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Rachael Sobrero, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

On September 19, 2011, the Petitioner pleaded guilty to one count of aggravated robbery and four counts of especially aggravated kidnapping. At the plea submission hearing, the State recited the factual basis for the Petitioner's plea as follows:

[O]n May 18th, 2009 in the early morning hours there were five employees in the Shoney's Restaurant located at Highway 70 South and I-40 in Bellevue[.] Francisco Perez, Teresa Kline, Dora Dalcroze, Arcilia Ruiz, and the manager on duty, Mr. Karnae, were present and preparing the business to open.

As the employees were getting the restaurant ready to open, just prior to 6 o'clock, Mr. Perez went to take the trash out the back door outside the kitchen. As he opened the door, two men rushed into the back. Both men were dressed in dark clothing, one had a mask on, both had guns.

The person with the mask on, who the investigation later reve[a]led was the co-defendant in this case, Jerome Teats [("the co-defendant")], first took Mr. Perez, held a gun to his head, and forced him into a hallway or a dry storage area back in the kitchen. It was a one-opening hallway in the back that had shelves on both sides. Mr. Perez went back into that area. And while that was going on, [the Petitioner] had Ms. Ruiz, held a gun to her head, asked her how many employees were in the restaurant, and then forced her to go back into the dry-storage hallway area. As that took place, . . . [the Petitioner] also asked Ms. Ruiz where the manager was, she indicated towards the office area in the kitchen, which was a small – basically closet in the back that had a desk and a safe in it.

[The co-defendant] then went to the area where the office was and Mr. Farina was in there. He went inside with the gun and took Mr. Farina out of the office and forced him towards the front of the restaurant where the register was. Ms. Dora Dalcroze observed this happening as she was coming back into the kitchen from the front of the restaurant where she had been setting up the buffet line.

As [the co-defendant] brought the manager up to the front area where the cash register was, [the Petitioner] was standing in the back blocking the exits to the hallway where the other individuals were. Ms. Dalcroze and Ms. Teresa Kline were the other two individuals that were not yet in the hallway. At that point in time, [the Petitioner] started speaking harshly to Ms. Dalcroze, who could not understand him. She spoke Spanish and wasn't understanding his English. He was yelling at her.

She – as she was walking to the hallway area, he held the gun on her, and [s]he was trying to get out of the line of the gun and he kept the gun focused on her and tracking her as she moved. She eventually, when Ms.

-2-

Teresa Kline came to the area, Ms. Kline brought them both to the area where [the Petitioner] was telling them to go.

At that point in time, all four employees were at the far end of the hallway. [The Petitioner] stood at the door – the opening area so that the four individuals in the back could not get past him. As that was going on, [the co-defendant] was in the front of the restaurant with the manager, he had pistol whipped him in the head and was demanding th[e] cash. He – the manager was able to open the cash register, and they, together, Mr. Farina being at gunpoint at this point in time, filled a plastic bag with all of the cash that was in the cash register.

After that took place, [the co-defendant] took the manager back to the hallway area where the remaining victims were, forced him into the hallway. Both the men told them all to get down on the ground and put their faces on the floor. Throughout this they were yelling not to look at them and look away. After all of the employees were on the floor in the back of the dry-storage area, both defendants left the Shoney's.

Across the street in a[n] office park called Harpeth Valley, a white blazer was parked. That blazer belong[ed] to [the co-defendant]. As the two men were running out of the restaurant, a customer who was there waiting for the restaurant to open observed them running and called 911. He actually followed one of the individuals, turns out to be [the co-defendant], as [the co-defendant] was running through the neighborhood, from th[e] office park area into a residential neighborhood. As that citizen was on the phone with 911, he stayed on the phone until he saw police and spoke with police at that time.

Police responded to the neighborhood area and were pointed in a direction of a house. And at that point in time Officer Regan and Sergeant Teet went to the crawl space of the house, which had been locked by a citizen in the area. They unlocked the crawl space and pulled out the co-defendant . . . .

At that point in time, [the co-defendant] was taken into custody, Sergeant Teet went – officers were still pursuing this other individual, [the Petitioner], who had run across I-40 and was last spotted running in the direction of Bellevue mall. Officers were pursuing him and approximately an hour later Officer Seroche and Sergeant Teet caught up with [the Petitioner]. He had been discarding several items of clothing as he was running in the area and he had been seen running through the grass and then laying down in the

grass trying to evade police. They did eventually catch up to him and take him into custody.

Both defendants were asked if they wanted to speak to police. [The Petitioner] told Detective Stokes, I didn't do anything, he did it all. Then told Detective Stokes, you can't charge me. [The co-defendant] spoke to police and admitted that he and [the Petitioner] drove to the area in the white blazer, waited for . . . somebody to come out of the restaurant and then went in the back and robbed it.

$737 in cash and coins was located in [the co-defendant's] vehicle, in a black plastic trash bag consistent with the trash bag on the floor of the Shoney's. Police recovered that, items of clothing that these defendants were described as wearing and [the co-defendant's] driver's license from the front seat of his vehicle.

After detectives gave the cash back to the manager, had a receipt signed for it, both defendants were charged with the robbery. On May 22, 2009, when Detective Stokes arrived for the preliminary hearing he learned that – initially it had been reported that both individuals wore masks, he learned at that point in time that that was not true. There had been a language barrier with a number of the victims at the restaurant. Upon hearing that one of them did not have a mask on, he asked the victims if they would participate in a photographic lineup. Ms. Dora Dalcroze went to west precinct and viewed the photographic lineup, she immediately picked out the photograph of [the Petitioner] as the person who was not wearing the mask in the back of the Shoney's on that day.

Ms. Dalcroze, Mr. Perez, and Ms. Ruiz [have] appeared in numerous hearings. And Ms. Dalcroze, every time she has been called to testify has consistently identified [the Petitioner] as the man who did not have a mask on who participated on that day of robbing the Shoney's and held the rest of the employees at gunpoint.

The Petitioner, at the hearing, denied being under the influence of drugs or alcohol or suffering from any mental health problems. He agreed that he had discussed the charges against him with his counsel ("trial counsel") and was satisfied with trial counsel's representation. He agreed that he understood that, by pleading guilty, he was waiving his rights to a jury trial represented by counsel; to call witnesses and cross-examine the State's witnesses; to testify or not testify at the trial; and to appeal the verdict and resulting sentence if the jury were to find him guilty. The Petitioner stated that he believed it to be in his best

interest to plead guilty. He understood that he was pleading guilty to felonies which could be used to enhance his sentence in a future felony case. The Petitioner denied that anyone was forcing him to plead guilty or that anyone was promising him anything other than the stipulations of the plea agreement.[1]

According to the Petitioner's plea agreement, the trial court sentenced the Petitioner as a Range II multiple offender to fifteen years at 35% for his aggravated robbery conviction and fifteen years at 100% each for his convictions of especially aggravated kidnapping, all to be served concurrently. The trial court entered the judgments against the Petitioner reflecting the terms of the agreement. The Petitioner subsequently filed for post-conviction relief alleging ineffective assistance of counsel and asserting that his plea was constitutionally invalid.

At the post-conviction hearing, the Petitioner testified that, originally, he planned to proceed to trial. On the day of trial, however, he pleaded guilty to all five of his indicted charges. He stated that he met with trial counsel at least six times prior to entering his plea. Trial counsel explained his charges to him, but the Petitioner did not understand why he was charged with kidnapping when he "didn't actually kidnap" anyone. He estimated that the entire incident for which he was charged lasted a period of approximately five minutes. Furthermore, he believed the evidence was insufficient to support a kidnapping "because of the intent. [His] intention was not to kidnap nobody [sic]." Post-conviction counsel asked the Petitioner, "Did [trial counsel] explain to you that a robbery and a kidnapping that happen so quickly . . . really couldn't be both?" The Petitioner responded, "No," and added that trial counsel did not explain any of the applicable case law. Furthermore, the Petitioner stated that, had trial counsel explained more regarding this issue, the Petitioner would not have pleaded guilty and instead would have proceeded to trial. He testified, "[M]y co-defendant was telling me that [trial counsel] was speaking to his lawyer telling him things about my case . . . . [Trial counsel] told him things that if she would've told me personally, I would've went [sic] to trial." The post-conviction court clarified this issue with the Petitioner, and the Petitioner explained, "[Trial counsel] told [the co-defendant's] lawyer that if I was to go to trial that I might not get charged for the robbery, but I might get charged for the kidnappings." Additionally, the Petitioner stated that he asked trial counsel to argue "under the Jencks" when she filed a motion to suppress the identification and other statements of the

---

[1] The Petitioner claims that he entered a "best interest" plea. At the guilty plea hearing, the only reference to such a plea was when the Petitioner stated the following to the trial court: "Well, I talked to my lawyers and it is really in my best interest to plead guilty to these charges." Determination of the issue of whether the Petitioner actually entered a best interest plea as opposed to a regular guilty plea is not material to the resolution of this appeal.

witness, Delacruz.[2] He also claimed that all he had from the police were "supplementary reports."

The Petitioner testified that he entered a "best interest" plea in this case because

I felt that I was not being presented [sic]. I felt that my lawyers was [sic] not ready to go to trial. They – she was telling me that I was going to get a life sentence and she called my father and told him the same thing to try to talk me out of going to trial.

Furthermore, he stated, "I didn't know how to exactly give a best interest plea but I verbally just said it." The Petitioner's final complaint about trial counsel was that he, on several occasions, asked trial counsel to look into whether some of the immigrant witnesses were "legal witnesses" but that "nothing else was done about that."

On cross-examination, the Petitioner acknowledged that, in addition to the six or more times that trial counsel met with him at the jail, trial counsel also met with him on the days of his numerous court appearances. Additionally, he acknowledged that trial counsel filed numerous pretrial motions and that the Petitioner was present at each of those hearings. When asked about his discussion with trial counsel regarding the kidnapping charges, the Petitioner stated that they discussed the charges but that "[i]t really wasn't a breakdown of the law." He further acknowledged discussing with trial counsel that he kept the victims "somewhere they didn't want to be" and that "there was a weapon involved." He also agreed that, during the incident, the victims could not reach an exit to the restaurant without passing the Petitioner. When discussing his desire to get the "statement" of Delacruz from the State, he agreed that one reason he might not have received that statement was because Delacruz, in fact, did not make a statement to police.

The Petitioner also recognized that, based on his prior felonies, he was eligible to serve twenty-five to forty years at 100% on each especially aggravated kidnapping conviction had he proceeded to trial. Therefore, he agreed that, if the trial court had chosen to run the sentences consecutively, he could have received a minimum sentence of one hundred years, not including the sentence for robbery. He also agreed that the State's offer of an effective sentence of fifteen years at 100% was substantially less than what he might have faced had he gone to trial.

The State asked the Petitioner to further explain some of his complaints against trial counsel. The Petitioner stated that he did not understand "the actual definition of especially aggravated kidnapping" and that trial counsel did not discuss this concept with him. He

---

[2] At the plea submission hearing, this witness' name was spelled "Dalcroze."

claimed that, had he understood the definition, he would not have pleaded guilty. With respect to the Petitioner's contention that his plea was unknowing and involuntary, he confirmed that he requested to enter a guilty plea on the day of trial. Furthermore, he agreed that, prior to his plea, he reviewed with trial counsel the charges for which he pleaded guilty as well as the sentences for each charge. He stated, "I knew that my lawyers wasn't [sic] fighting for me. I didn't know what else to do. And [trial counsel] told me that I can give a best interest plea."

The State entered a transcript of the guilty plea hearing into evidence and then called trial counsel to testify. Trial counsel testified that all of her practice since 2004 had been devoted to criminal defense work. Prior to the Petitioner's case, trial counsel had participated in four jury trials: a murder case; an order of protection case; a drug case; and a rape of a child case. She had a software database documenting all of her encounters with the Petitioner, and, according to her data, personnel from trial counsel's office met at the jail with the Petitioner approximately twenty-three times. Of those occasions, trial counsel estimated that she personally was present approximately twenty times. She also exchanged written correspondence with the Petitioner approximately five to ten times. Trial counsel acknowledged that another attorney ("assistant trial counsel") was assigned to assist her in the Petitioner's case at trial.

Trial counsel discussed the numerous pretrial motions that she filed on the Petitioner's behalf. The State asked trial counsel about her discussions with the Petitioner regarding "the motions on the especially aggravated kidnapping counts, and the double jeopardy issue, and dismissing those." Trial counsel responded,

> We . . . talked a lot about that issue. . . . That issue was in flux in the Tennessee Supreme Court, so through the life of [the Petitioner's] case the law was changing. And then it was sort of up in the air so we had a lot of discussions because . . . this Jason Lee White case was pending for such a long time . . . .
>
> We laid out for him where the law – which direction the law had been going, which was bad for the defense, and where it might end up. But, I mean, we spent, I would say, hours discussing that. And I was actually writing the amicus brief on the issue, so I was very familiar with it.

Trial counsel stated that she found a letter she sent to the Petitioner spelling out exactly what the State was required to prove as to his indicted counts. The State asked trial counsel whether the Petitioner eventually seemed to understand the especially aggravated kidnapping law. Trial counsel stated, "Yes. [The Petitioner] would often . . . say he didn't understand things, and we would break it down and go over these sort of subparts of it. And

-7-

a lot of times it seemed sort of what he was saying was it didn't seem right, or fair, or reasonable."

Trial counsel agreed that she reviewed with the Petitioner his potential sentence if he proceeded to trial. She forwarded everything to the Petitioner that she received from the State. Regarding the immigration status of the victims, trial counsel could not remember what she filed on the issue. She did remember that it was an issue she would have to address in a jury-out proceeding at trial but that she never got to that point. She had learned from the co-defendant's trial that the victims were working legally in the United States.

Trial counsel testified that, leading up to and on the day of the trial, she explained to the Petitioner that he "didn't have a credible defense on the aggravated robbery count." Furthermore, trial counsel stated that the Petitioner eventually agreed. Therefore, the main issue at trial would be the especially aggravated kidnapping counts. Trial counsel testified further,

> And when we did the math, what we estimated the Judge's sentence would be just on the ag[gravated] robbery, basically if we had won with our defense . . . we just . . . said maybe about 18 years would be a reasonable sentence from this Court in this situation.

> And when we did the math realized that the offer probably would have been a matter of months of a difference of our best case scenario and what the offer was. So what we explained to him was going to trial to save you six months or so, but what we[ a]re risking is the rest of your life.

From that discussion, the Petitioner indicated his desire to plead guilty. She stated, "I think he – all I can say is I think [the Petitioner] understood what we were saying about it just not being worth it to go to trial, that we were fighting for too little and risking too much." Trial counsel confirmed that she reviewed the written plea petition with the Petitioner. She testified that she was ready for trial if the Petitioner had decided not to enter a plea.

Assistant trial counsel testified that she assisted trial counsel in the Petitioner's case. According to her documentation, she was present on five of the occasions that trial counsel met with the Petitioner. She also was present for all hearings that occurred once she began assisting trial counsel with the case. She stated that, during those discussions, "[w]e would try to explain to him . . . how the law and the facts could apply, especially during the course of a jury trial." Furthermore, she noted that the Petitioner

would frequently say I don't understand . . . . And then we would always say, explain to us what you don't understand so we can go back through it again. . . . And then he would always end with, I think I understand, so we didn't have any reason to believe he didn't understand how the law, in fact, has to be applied to his particular case.

Assistant trial counsel clarified with the court that the Petitioner seemed not to understand how the facts of his case could equate to kidnapping. Regarding the Petitioner's decision to plead guilty, assistant trial counsel stated, "I had an indication that he was reluctant about . . . his decision, but I felt that he understood what he was doing."

The post-conviction court took the matter under advisement and issued a written order denying post-conviction relief. In its order, the post-conviction court accredited trial counsel's testimony that she met with the Petitioner at least twenty times "and thoroughly discussed with him the evidence and the elements of the crimes for which he was charged." The court also noted that the Petitioner failed to present any evidence at the hearing to support his allegation that trial counsel was not prepared for trial. Accordingly, the post-conviction court determined that the Petitioner failed to prove his ineffective assistance of counsel claim.

Next, the post-conviction court considered the Petitioner's claim that "he was forced to enter the plea based upon [trial] counsel's lack of preparation for trial." Once again, the court accredited trial counsel's testimony that she "investigated the case and discussed all evidence with the [P]etitioner." After reviewing the transcript of the guilty plea hearing, the post-conviction court determined that the Petitioner failed to prove that his plea was unknowing or involuntary. Thus, the court denied relief, and the Petitioner timely appealed. On appeal, the Petitioner argues that his plea was constitutionally invalid and that he received ineffective assistance of counsel.

**Analysis**

*Standard of Review*

Relief pursuant to a post-conviction proceeding is available only where the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006). See Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v.

State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

*Ineffective Assistance of Counsel*

The Petitioner argues on appeal that he was denied effective assistance of counsel. The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[3] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act. See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868.

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel. Goad, 938 S.W.2d at 370. Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. Id.

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688)). Our supreme court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal

---

[3] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)). When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). In the context of a guilty plea, our analysis of this prong

focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

Hill v. Lockhart, 474 U.S. 52, 59 (1985); see also Calvert v. State, 342 S.W.3d 477, 486 (Tenn. 2011).

The Petitioner claims that trial counsel failed to "explain to him that there was a kidnapping statute and that the evidence in his case was insufficient to support a kidnapping conviction." Furthermore, the Petitioner contends that trial counsel "never reviewed State v. Anthony[, 817 S.W.2d 299 (Tenn. 1991), overruled by State v. White, 362 S.W.3d 559 (Tenn. 2012),] and its progeny with him which h[e]ld that a kidnapping cannot be 'essentially incidental' to the underlying robbery." He maintains that "had he known about the State v. Anthony issue he would not have entered a plea[] but would have proceeded to trial."

-11-

At the post-conviction hearing, trial counsel testified that she met with the Petitioner approximately twenty times at the jail prior to trial. She also exchanged written correspondence with the Petitioner approximately five to ten times. Trial counsel stated that she thoroughly discussed with the Petitioner the law pertaining to his especially aggravated kidnapping charges. She estimated that she spent "hours" discussing this issue because it "was in flux in the Tennessee Supreme Court." She noted that she was current on the issue because of her involvement writing an amicus brief in the White case.

Trial counsel stated that, throughout these discussions of the law, the Petitioner at first would say that he did not understand. Once they reviewed everything, however, trial counsel believed that the Petitioner understood the law but did not think that the law was "right, or fair, or reasonable." At the hearing, the Petitioner acknowledged discussing with trial counsel that he kept the victims "somewhere they didn't want to be" and that "there was a weapon involved."

The post-conviction court accredited trial counsel's testimony that she met with the Petitioner at least twenty times "and thoroughly discussed with him the evidence and the elements of the crimes for which he was charged." The Petitioner has failed to establish deficient performance on the part of trial counsel. Thus, we do not need to address the prejudice prong. See Goad, 938 S.W.2d at 370. Accordingly, the Petitioner is entitled to no relief on this basis.

The Petitioner also avers that trial counsel was not ready for trial, which was why the Petitioner decided to enter a "best interest" plea on the day of the trial. His main assertion at the post-conviction hearing was that trial counsel "was telling [him] that [he] was going to get a life sentence" and that she also told his father this information "to try to talk [the Petitioner] out of going to trial." However, the Petitioner provided no other testimony or evidence in furtherance of the contention that trial counsel was not prepared adequately for trial.

Trial counsel confirmed that she was ready for trial if the Petitioner had decided not to plead guilty and instead proceed to trial. However, trial counsel testified that

> when we did the math [we] realized that the offer probably would have been a matter of months of a difference of our best case scenario and what the offer was. So what we explained to him was going to trial to save you six months or so, but what we[ a]re risking is the rest of your life.

Trial counsel stated that, from this discussion, the Petitioner decided to enter his plea.

On cross-examination at the post-conviction hearing, the Petitioner acknowledged that, based on his prior felonies, he was facing a potential sentence of at least one hundred years if convicted by a jury of these offenses and if he received consecutive sentencing. He also agreed that his plea-bargained sentence of fifteen years was substantially less than what he might have faced had he gone to trial.

The post-conviction court found that the Petitioner failed to present any evidence at the hearing to support his allegation that trial counsel was not prepared for trial. We agree. Thus, the Petitioner has failed to establish that trial counsel's performance was deficient in this regard. Therefore, we need not address the prejudice prong. See Goad, 938 S.W.2d at 370. Accordingly, he is entitled to no relief on his ineffective assistance of counsel claim.

*Validity of the Plea*

The Petitioner also asserts that his plea was constitutionally invalid. Specifically, the Petitioner claims that he believed that trial counsel was not prepared for trial and that, for that reason, he pleaded guilty. Additionally, he insists that he "was unaware that there was a possibility that the kidnapping charge would be dismissed" and that, had he been aware of this possibility, he would not have pleaded guilty. The Petitioner's argument seems to fall more squarely under an ineffective assistance of counsel claim, which we already have addressed. Nevertheless, we will consider the validity of the Petitioner's plea.

To be valid, a plea must be entered knowingly, voluntarily, and intelligently. See Boykin v. Alabama, 395 U.S. 238, 242-44 (1969); State v. Mackey, 553 S.W.2d 337, 340 (Tenn. 1977) superseded on other grounds by Tenn. R. of Crim. P. 37(b) and Tenn. R. of App. P. 3(b). A plea meets constitutional muster when the defendant understands both what the plea connotes and its consequences, Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (citing Boykin, 395 U.S. at 244), and makes a voluntary and intelligent choice from the alternative courses of action available to plead guilty, Jaco v. State, 120 S.W.3d 828, 831 (Tenn. 2003) (citing North Carolina v. Alford, 400 U.S. 25, 31 (1970)). In Mackey, 553 S.W.2d at 341, our supreme court set forth the procedure that a trial court should follow when accepting a plea in order to ensure that a defendant's plea is knowing, voluntary, and intelligent. See also Tenn. R. Crim. P. 11(b). A trial court must "substantially" comply with this procedure. State v. Newsome, 778 S.W.2d 34, 38 (Tenn. 1989).

We have reviewed the transcript of the guilty plea hearing and conclude that the Petitioner's plea was constitutionally sound. At the guilty plea hearing, the Petitioner acknowledged that he understood: the nature of the charges for which he was pleading guilty and the potential sentencing ranges; his right to representation by counsel at trial; his right to a jury trial, wherein he could cross-examine the State's witnesses and he could but would not be forced to testify; his right to an appeal; and that these felony convictions could be used

against the Petitioner in future proceedings to enhance his sentence in a future felony case. The Petitioner also denied that anyone was forcing him to enter into this guilty plea or that anyone was promising him anything other than what was included in the plea agreement. The Petitioner has failed to establish that he did not knowingly, intelligently, and voluntarily enter into his plea agreement. Accordingly, the Petitioner is not entitled to post-conviction relief on this basis.

## CONCLUSION

For the foregoing reasons, the Petitioner has failed to establish that he is entitled to post-conviction relief. Therefore, we affirm the judgment of the post-conviction court denying relief.

_____
JEFFREY S. BIVINS, JUDGE